IN THE OREGON TAX COURT

Robert RONDEAU,
Benton County Assessor
*v.*
DEPARTMENT OF REVENUE
WITHAM HILL INVESTORS,
*Intervenor*
(TC 2804)

Jeffrey G. Condit, Benton County Counsel, Corvallis, represented plaintiff.

James H. Conley, Salem, represented intervenor.

Decision for intervenor rendered October 9, 1989.

**CARL N. BYERS, Judge.**

Plaintiff, assessor, appeals from Department of Revenue Opinion and Order Nos. 87-1120, 87-1775 and 87-2554, reducing the assessed value of the subject property. The property owner intervened and defended.

The subject property consists of two separately developed but adjacent apartment complexes. The Ridgeview "A" complex, constructed between 1966 and 1968, consists of 218

units on 17.42 acres. The Ridgeview "B" complex, constructed between 1976 and 1978, consists of 163 units on 7.07 acres. The property is located in a desirable residential neighborhood in northwest Corvallis. It fronts on Witham Hill Drive, a main arterial which gives ready access to the rest of the city.

Two facets of the property are unusual. The first is the history of its ownership. The evidence established that Citizen's Savings and Loan Association ("Citizen's"), a local financial institution, acquired Ridgeview "A" in a trade in 1984. Citizen's was in financial trouble. Mr. Charles Kingsley and others were shareholders in Citizen's. They were also involved in joint venture projects with Citizen's totaling approximately $90-$100 million. Mr. Kingsley testified that it was very important to keep Citizen's from becoming insolvent.

Mr. Kingsley, through various associated interests, also directed the activities of Walker-Pietka & Associates ("Walker-Pietka"), a group of investors in need of "tax shelter." Mr. Kingsley testified that he arranged for Walker-Pietka to purchase Ridgeview "A" from Citizen's for $4,500,000. He also arranged for Walker-Pietka to buy Ridgeview "B," owned by parties not connected with Citizen's, for $3,275,000. Thus, Walker-Pietka paid, or agreed to pay, over $7 million for the subject property in 1984. The price paid to Citizen's was admittedly in excess of its market value and was structured to help Citizen's. Moreover, Citizen's was to make additional loans to be used to renovate Ridgeview "A." However, Citizen's was unable to meet its commitment for the additional funds to repair the property. Far West Federal Bank, another financial institution holding a lien against both Ridgeview "A" and Ridgeview "B," foreclosed its lien against all interested parties. Subsequently, Citizen's redeemed the property, foreclosed Walker-Pietka's interest and then negotiated a sale to intervenor for $3,375,000 in June of 1987. As part of the negotiations, intervenor agreed to pay $425,000 to Charles Kingsley for his services in clearing title to the property.

The second unusual aspect was the condition of the property. Ridgeview "B" was in need of some maintenance and cleanup. Mr. Jones, a partner in intervenor, considered it

a "distressed property." He indicated that some units had been cannibalized for sinks, toilets or other appliances. Also, the roof material was defective and some settling in the entrances and brickwork had occurred.

Ridgeview "A," however, was, by comparison, a total disaster. Gross mismanagement, or lack of management, resulted in some units becoming totally uninhabitable. The buildings were one story with flat roofs. Apparently the roofs were not cleaned. This caused water to accumulate and leak into the living areas, creating widespread moisture damage. Photographs submitted showed major rotting, mold, water-damaged ceilings and floor tiles, and mushrooms growing out of the carpet. Plaintiff concedes that 45 of the 218 units were uninhabitable. Intervenor's evidence indicated that there were approximately 60 to 70 units uninhabitable and several more that should not have been rented.

■ Plaintiff's appraiser valued the subject property using the traditional three approaches: the cost approach, the market comparison approach and the income approach. Placing the greatest reliance upon the income approach, he found a true cash value for the subject property of $6,572,000 for 1985, $6,178,000 for 1986 and $5,322,000 for 1987. Without going into unnecessary detail, the court finds that plaintiff's appraisal did not make adequate allowance for the physical condition of the property. Plaintiff's appraiser projected rental income on the assumption that only 45 units were uninhabitable. The court finds that there were more than 45 units in need of substantial repairs. Plaintiff's market approach, which derived a gross rent multiplier, was subject to the same weakness.

Plaintiff's position is that the sale to intervenor in 1987 was not a valid indication of market value. In plaintiff's view, this was a sale of a distressed property by a distressed seller. On the other hand, plaintiff views the 1984 sale of Ridgeview "B" as a valid indication of market value. That sale occurred just before the appraisal date in 1985. Plaintiff reasons that since Ridgeview "B" sold for $3,275,000, the value for both complexes must far exceed the $3,375,000 intervenor paid for the property in 1987.

In support of his position, plaintiff submitted an appraisal performed for intervenor before intervenor purchased the property. This appraisal found an estimated value of $6,768,000. Mr. Kelly, who participated in making that appraisal, testified that it assumed $1.5 million in renovation costs to achieve the $6.7 million value. Before renovation, he believed that the property had an "as is" value of $4,320,000. The court, however, finds the same problems with this appraisal as with plaintiff's appraisal. That is, Mr. Kelly's appraisal indicates that only 33 units were not rented due to disrepair. The evidence indicates that the number of uninhabitable units was at least twice that.

Intervenor's position is that the 1987 purchase price is the best evidence of value. Mr. Jones, one of intervenor's principals, testified the property had a terrible reputation due to mismanagement as well as being in deplorable physical condition. In support of its position, intervenor submitted the appraisal made for Citizen's Savings & Loan in April of 1986. Mr. Barton DeLacey, who performed that appraisal, testified that the purpose of the appraisal was to determine the true cash value of the property. His appraisal determined that the property had a value of $3,463,000. Mr. DeLacey testified that, in his opinion, this value was appropriate for January 1, 1985, January 1, 1986 and January 1, 1987.

In attacking intervenor's position, plaintiff introduced evidence that intervenor borrowed $4,450,000 on the subject property to buy it. Mr. Jones testified that the bank which made the loan knew how much intervenor paid for the property. He stated that the bank would not have made the loan without the purchaser's personal guarantees. Also, the bank required intervenor to put up $1.5 million for renovation. The court notes that the title insurance policy for the subject property was $4,870,000

After reviewing the evidence, the court finds that the 1987 purchase price of the property is the best evidence of value. While plaintiff's appraisal appears to be based upon a reasonable view of the data, that data is not drawn from severely distressed properties. In the absence of an actual sale, appraisers might be required to use market data and then attempt to adjust for the distressed condition of the subject. However, where there is a sale of the subject property, meeting

all the conditions of a valid market transaction, that sale is more persuasive than estimates derived from property not in a comparable condition. *Kem v. Dept. of Rev.,* 267 Or 111, 514 P2d 1335 (1973).

Contrary to plaintiff's view, the court finds that the subject property was adequately offered on the market. The seller received numerous offers or expressions of interest, all within a reasonable range of the actual sales price. It may be that the property was distressed and potential purchasers were seeking a "bargain." However, the price paid by a knowledgeable buyer is better evidence of market value than the opinion of others who have little to lose by a mistake in their opinion. This observation is not intended as a criticism of plaintiff's work, which appears to be both conscientious and thorough. It is intended to comment on the risk perceived by a purchaser of distressed property.

The court also finds that the $425,000 paid to Charles Kingsley for his services should be added to the purchase price. The evidence established that without Kingsley's services, intervenor would not have gone forward with the transaction. Accordingly, the court views that amount as a cost to intervenor of purchasing the property.

The court, therefore, finds that the true cash value of the subject property as of January 1, for each of the three years involved, was $3,800,000.

Costs to neither party.